**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**DOUGLAS AMES,**

                        **Plaintiff,**

  vs.                                                         **9:12-cv-01487**
                                                                 **(MAD/RFT)**

**CORRECTION OFFICER JAMES STEVENS;**
**CORRECTION OFFICER DAVID SMITH;**
**CORRECTION OFFICER THOMAS SCHUNK;**
**LIEUTENANT CHRISTOPHER MCDERMOTT;**
**in their individual capacities,**

                        **Defendants.**
_____

**APPEARANCES:**                                  **OF COUNSEL:**

**ORRICK, HERRINGTON &**             **J. PETER COLL, Jr., ESQ.**
**SUTCLIFFE LLP**                        **ALVIN LEE, ESQ.**
51 West 52 Street                       **AYANNA LEWIS-GRUSS, ESQ.**
New York, New York 10019
Attorneys for Plaintiff

**OFFICE OF THE NEW YORK**         **JAMES McGOWAN, AAG**
**STATE ATTORNEY GENERAL**        **RYAN MANLEY, AAG**
Litigation Bureau
The Capitol
Albany, New York 12224
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

     Plaintiff Douglas Ames, a New York State prison inmate, commenced this action pursuant to 42 U.S.C. § 1983 claiming that his constitutional rights were violated while he was incarcerated at Coxsackie Correctional Facility. *See* Dkt. Nos. 1, 26. Plaintiff claims that Defendant Corrections Officers Thomas Schunk and James Stevens and Defendant Lieutenant

Christopher McDermott retaliated against him for exercising his First Amendment rights, and Plaintiff also claims that Defendant Correction Officer Smith violated his Eighth Amendment through the use of excessive force. *See* Dkt. No. 1.

Currently before the Court are the parties' motions *in limine*.

## II. BACKGROUND

Plaintiff was an inmate at Coxsackie Correctional Facility ("Coxsackie") from November 2007 through June 2010. *See* Dkt. No. 48-4 at 47.[1] During that time, he worked at the Coxsackie law library as an administrative clerk from March 31, 2008 through June 8, 2008, a paralegal assistant from June 9, 2008 through March 22, 2009, a clerk typist from July 27, 2009 through December 27, 2009, and a paralegal assistant from February 1, 2010 through June 13, 2010. *See* Dkt. No. 48-4 at 49-50. Plaintiff left his law library positions twice for disciplinary reasons. *See id.* Plaintiff claims that Defendant Correction Officers unlawfully retaliated against him for exercising his constitutional rights to file grievances, provide legal assistance to inmates, and write complaints reporting abuse of other inmates and, therefore, violated his First Amendment rights. *See* Dkt. No. 26 at ¶¶ 85-89. Plaintiff claims that Defendant Correction Officers retaliated by filing false misbehavior reports. *See* Dkt. No. 26 at ¶¶ 38, 45, 47, 49-51, 53-56, 58, 60-61, 66-67, 74.

As for the First Amendment retaliation claims against Defendants Schunk and McDermott, Plaintiff alleges that, on December 15, 2009, inmate Dashawn Andrews was being beaten in an adjacent cell. *See* Dkt. No. 26 at ¶ 59. When Defendant Schunk walked past, Plaintiff told him that he intended to write a complaint to the inspector general about the abuse.

---

[1] To avoid confusion, anytime the Court references a specific page number for an entry on the docket, it will cite to the page number assigned by the Court's electronic filing system.

2

*See id.* Plaintiff contends that in retaliation for stating his intention to complain to the inspector general about inmate abuse, Defendant Schunk filed a misbehavior report against him. *See id.* at ¶ 60. On December 17, 2009, Defendant McDermott presided over Plaintiff's Tier II hearing. *See id.* Plaintiff was sentenced to thirty days of keeplock. *See id.* Plaintiff asked Defendant McDermott why he was being punished based upon false reports, and Defendant McDermott allegedly replied, "That's what happens when you talk to I.G. about my officers." *See id.* at ¶ 61.

Plaintiff claims that Defendant Stevens was the main actor in retaliating against him. *See* Dkt. No. 26 at ¶ 3. Plaintiff claims that Defendant Stevens retaliated against him for filing grievances on his own behalf and the legal assistance he provided to other inmates. *See id.* However, Plaintiff claims that he assisted another inmate with filing a grievance against Defendant Stevens in the Summer of 2009, which was an instigating factor for Defendant Stevens to file six misconduct reports against Plaintiff between July 27, 2009 and December 8, 2009. *See* Dkt. No. 26 at ¶¶ 3, 33, 36, 43, 58. Plaintiff also claims that Defendant Stevens interfered with the legal assistance that he was providing to another inmate in the law library on August 20, 2009. *See* Dkt. No. 26 at ¶ 51. The legal assistance Plaintiff provided triggered Defendant Stevens to retaliate against him, according to the amended complaint. *See* Dkt. No. 26 at ¶¶ 51, 54-58.

Plaintiff also contends that Defendant Smith used excessive force against him in violation of the Eighth Amendment. *See* Dkt. No. 26 at ¶¶ 90-94. According to Plaintiff's testimony, Defendant Smith came to retrieve and escort Plaintiff to the deputy superintendent on May 17, 2010. *See* Dkt. Nos. 26; 48-3 at 101. Plaintiff and another inmate were being escorted together to a common area to be frisked for weapons. *See* Dkt. No. 48-3 at 103. In this common area, Defendant Smith put his hand in front of Plaintiff's face and said, "Next time you hurry up. You too slow." *See id.* at 104. In a loud voice, Plaintiff told Defendant Smith, "Get your hand out of

3

my face," and Defendant Smith replied, "You lucky that's all I'm doing." *See id.* at 105. As described by Plaintiff, either simultaneous with or shortly after his statement to Defendant Smith, Plaintiff raised both hands, turned, and took two steps away from him. *See id.* at 104, 106. Defendant Smith then landed one, closed-fisted punch to the side of Plaintiff's head and took Plaintiff face down to the ground in a bear hug. *See id.* at 104, 107, 110. While holding Plaintiff down flat with his knee on the small of the back, Defendant Smith handcuffed Plaintiff. *See id.* After Plaintiff was handcuffed, Defendant Smith said, "Take that to federal court." *See id.* Plaintiff did not sustain any further physical assault or battery. *See id.* at 110-11.

Defendants filed a dispositive motion on May 1, 2014. *See* Dkt. No. 48. The Court determined that Plaintiff raised material questions of fact to be resolved by a jury on his claims for First Amendment retaliation and violation of his Eighth Amendment. *See* Dkt. No. 58. Both parties have filed motions *in limine*, which are now pending before the Court. *See* Dkt. Nos. 78, 87, 88.

### III. DISCUSSION

**A.    Standard**

The purpose of a motion *in limine* is to allow the trial court to rule in advance of trial on the admissibility of certain forecasted evidence. *See Luce v. United States*, 469 U.S. 38, 40 n. 2 (1984); *see also Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996). A court should exclude evidence on a motion *in limine* only when the evidence is clearly inadmissible on all potential grounds. *See Baxter Diagnostics, Inc. v. Novatek Med., Inc.*, No. 94 Civ. 5220, 1998 WL 665138, *3 (S.D.N.Y. Sept. 25, 1998). Courts considering a motion *in limine* may reserve decision until trial so that the motion is placed in the appropriate factual context. *See Nat'l Union Fire Ins. Co. v. L.E. Myers Co. Group*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996). Alternatively, the court is

"free, in the exercise of sound judicial discretion, to alter a previous *in limine* ruling" at trial as "the case unfolds, particularly if the actual testimony differs from what was contained in the [movant's] proffer." *Luce*, 469 U.S. at 41–42.

**C. Analysis**

*1. Adverse Inference Charge*

Plaintiff claims that he is entitled to an adverse inference regarding the video recording from May 17, 2010 because, according to Plaintiff, Defendants failed "to preserve critical video evidence." *See* Dkt. No. 88 at 1. "[A] party seeking an adverse inference instruction based on the destruction of evidence must establish (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002) (quoting *Byrnie v. Town of Cromwell*, 243 F.3d 93, 107-12 (2d Cir. 2001).

Plaintiff's submission in support of his motion for an adverse inference does not support his request. At Plaintiff's Tier 3 Hearing, he requested a video tape from the camera in the hallway, and when the tape was played the screen was black with some lines. *See* Dkt. Nos. 88-3 at 125; 88-4 at 6. The video tape played for less than five minutes at the hearing when it was turned off. *See* Dkt. No. at 6-7. Correction Captain Christopher Miller was the deputy supervisor of security at Coxsackie Correctional Facility beginning in September 2010. *See* Dkt. No. 88-2 at 14-16, 34. He testified that the VHS equipment that was in use in May 2010 was of poor quality. *See id.* at 33. The VHS tapes would wear out and equipment would break and, for this reason, Correction Captain Miller recommended and participated in the replacement and update of the

5

video equipment. *See id.* Plaintiff does not claim to have ever seen any video evidence and cannot represent to this Court that any video was ever created by the hallway camera on May 17, 2009. This Court finds that there is no indication that Defendants destroyed video evidence, intentionally or negligently. There is no evidence that a clear video tape from the hallway camera, outside of the A1 room, was ever created or existed. Therefore, there is no support for the inference that Defendants possessed and then destroyed any actual evidence. Likewise, no reasonable inference can be drawn about the Defendant's state of mind in the destruction of any evidence.

Correction Captain Christopher Miller also testified that there was no video equipment in the A1 area. *See* Dkt. No. 88-2 at 23. At the Tier 3 hearing, Plaintiff expressed doubt as to whether the video camera lense was wide enough to capture any images inside the A1 room. *See* Dkt. No. 88-4 at 6. At his deposition, Plaintiff testified that, on May 17, 2010, he was inside the television room, A1, and that there were no video cameras inside that room, *see* Dkt. No. 88-3 at 122-123, which is twenty by thirty feet in dimensions. *See* Dkt. No. 52-25 at 19. Plaintiff testified that there was a hallway camera outside of the room, but he did not know if the hallway camera worked. *See* Dkt. No. 88-3 at 122. Plaintiff also admitted that the hallway camera is pointed in the direction of the hallway and that he does not know what the camera would have shown. *See* Dkt. No. 88-3 at 123-24. Plaintiff speculates that the video would have shown him and Defendant Smith through the window, but testified that he has never seen video from that camera. *See id.* at 124. Accordingly, Plaintiff has also failed to establish that any proposed video evidence would have been relevant to this action.

### 2. *Past Criminal Convictions*

Plaintiff moves to preclude any reference to, or the introduction of, evidence of Plaintiff's past criminal convictions, and Plaintiff also seeks to preclude Defendants from referring to Plaintiff as a "persistent violent felony offender." *See* Dkt. No. 87 at 1-8. As agreed at the September 9, 2015 pretrial conference, Defendants will not refer to Plaintiff as a "persistent violent felony offender." With regard to Plaintiff's convictions, Plaintiff only seeks to preclude those convictions that are unrelated to his current incarceration. *See id.* at 2-6. Separately, Defendants moved to permit cross-examination of Plaintiff with the statutory names of the offenses, the dates of conviction, and the overall sentence imposed. *See* Dkt. No. 78 at 4-6.

Rule 609 of the Federal Rules of Evidence states that evidence of a criminal conviction of any witness, except for a criminal defendant, "must be admitted, subject to Rule 403" where the crime is punishable by imprisonment for more than one year. Rule 609(b) limits admissibility of those convictions, or the release from confinement for the conviction – whichever is later, to the past ten years unless "its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect."

The Court grants Defendants' motion to permit the impeachment of Plaintiff on cross-examination with the statutory name of each felony offense, the date of conviction, and the sentence imposed within the last ten years. The Second Circuit has held that Rule 609(a)(1) contemplated admitting in to evidence these "essential facts" of a witness's convictions. *See United States v. Estrada*, 430 F.3d 606, 615 (2d Cir. 2005). In his motion, Plaintiff does not seek to preclude the felony convictions for which he is currently being incarcerated. To the extent that Defendants are seeking to also impeach Plaintiff with convictions greater than ten years old, the Court reserves on that portion of the Defendant's motion until such time that an accurate criminal history with specific underlying facts of each crime are presented to the Court.

### *3. Plaintiff's Criminal and Disciplinary History*

Defendants argue that they are entitled to "illicit testimony regarding Plaintiff's criminal history and disciplinary history while incarcerated" because, in a First Amendment retaliation claim, Plaintiff must show that Defendants' adverse acts rise to the level of retaliation, i.e, those acts where a similarly situated individual of ordinary firmness would be deterred from exercising his or her constitutional rights. *See* Dkt. No. 78 at 3-4. Defendants correctly state that the standard requires an objective inquiry, *see Davis v. Goord*, 320 F.3d 346, 354 (2d Cir. 2003), but then Defendants argue that they are entitled to inquire into Plaintiff's specific criminal and disciplinary history in order to establish a similarly situated *inmate*. *See* Dkt. No. 78 at 3-5. Defendants assert that a similarly situated *inmate* would be someone with Plaintiff's criminal history and disciplinary history. Defendants claim that an *inmate*, such as Plaintiff, is a person who is undeterred by restrictions on his liberties imposed by repeated confinements. This argument fails for at least the following reasons.

First, the standard applied to determine if an adverse action rises to the level of retaliation is an "objective inquiry" and it is "'not static across contexts,' but rather must be 'tailored to the different circumstances in which retaliation claims arise.'" *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (distinguishing between the tolerance expected of an inmate as compared to a public employee). The courts have identified the general population of inmates as individuals who are similarly situated for purposes of First Amendment retaliation cases. *See Davis*, 320 F.3d at 353; *Dawes*, 239 F.3d at 493; *Gill v. Pidlypchak*, 389 F.3d 379, 382 (2d Cir. 2004) (discussing the different sorts of retaliation cases that are susceptible to different requirements). There is no indication in the case law that the Second Circuit intended for the objective standard, i.e., individuals similarly situated, should be

8

broken down to similarly situated inmates based upon criminal history. Accordingly, the Court does not agree with Defendants that the standard requires an inquiry into whether a similarly situated *inmate* of ordinary firmness would be deterred from the exercise of his or her constitutional rights. Permitting Defendants to inquire into Plaintiff's criminal history and disciplinary history, upon these grounds, would be tantamount to analyzing the objective inquiry, set forth by the Second Circuit, as a subjective one.

Moreover, the Court does not agree with Defendants' proffered inference – that if a person is a repeat criminal who is presumably undeterred by incarceration, then that person would be less deterred from exercising his constitutional rights when faced with adverse acts. Plaintiff's criminal or disciplinary history does not have any significant probative value on whether Defendants' actions would deter him from pursuing grievances, and, as is the case here, Plaintiff's specific criminal or disciplinary history is certainly not probative of what actions would deter a reasonable inmate from pursuing his constitutional rights.

For both these reasons – independently and collectively, the Court will not permit Defendants to illicit testimony about Plaintiff's criminal history and disciplinary history upon these grounds. That is not to say, however, that Defendants are precluded from making inquiry into these matters depending on the proof put forth by Plaintiff.

### *4. Collateral Estoppel*

Defendants next argue that Plaintiff's retaliation claim related to a misbehavior report dated November 30, 2009 is barred by the doctrine of collateral estoppel. *See* Dkt. No. 748 at 15-17.[2] The *Rooker-Feldman* doctrine holds that the only federal court that has subject matter

---

[2] It should be noted that the only submissions by Defendants is the Article 78 Decision and Order. *See* Dkt. No. 78-4.

jurisdiction to review state court judgments is the United States Supreme Court. *See Johnson v. Smithsonian Inst.*, 189 F.3d 180, 185 (2d Cir. 1999) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). The doctrine "also bars federal courts from considering claims that are 'inextricably intertwined' with a prior state court determination." *Johnson*, 189 F.3d at 185.

At a minimum, the courts have determined that inextricably intertwined means that "a federal plaintiff had an opportunity to litigate a claim in a state proceeding." *Vargas v City of New York*, 377 F.3d 200, 205 (2d Cir. 2004). "The doctrine is generally applied coextensively with principles of res judicata (claim preclusion) and collateral estoppel (issue preclusion)." *Id.* It should be noted that even where an unsuccessful Article 78 proceeding is the basis for a section 1983 action, "only issue preclusion triggers the *Rooker-Feldman* bar" because by its nature, "an Article 78 proceeding does not have the power to award the full measure of relief available in subsequent section 1983 litigation." *Vargas*, 377 F.3d at 205. Therefore, in order to determine whether Plaintiff's First Amendment retaliation claim is barred by the *Rooker-Feldman* doctrine, the Court must apply New York's collateral estoppel rules. *See id.*

Under New York law, which must be strictly applied, "the doctrine of issue preclusion only applies if (1) the issue in question was actually and necessarily decided in a prior proceeding, and (2) the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the first proceeding." *Colon v. Coughlin*, 58 F.3d 865, 869 (2d Cir. 1995) ("Issue preclusion will apply only if it is quite clear that these requirments have been satisfied, lest a party be precluded from obtaining at least one full hearing on his or her claim" (internal quotation omitted)). Here, Plaintiff's Article 78 proceeding challenged a December 8, 2009 disciplinary determination. *See* Dkt. No. 78-4. The only claim made to the state court was that the disorderly cell rule was unconstitutionally vague, and the state court concluded that the

10

disciplinary rule was not unconstitutionally vague. *See id.* at 3. In his reply papers, Plaintiff attempted to further challenge the determination that he refused to follow a direct order, but the state court declined to address that issue because it was not raised in the petition. *See id.* at 4.

It is clear from the Article 78 decision and order that Plaintiff's First Amendment retaliation claims and the Eight Amendment claim were not issues that the state court actually or necessarily decided. Accordingly, the Court finds that the *Rooker-Feldman* doctrine does not bar Plaintiff's action.

### 5. *The Correctional Association of New York's May 2010 Report*

Defendants seek to preclude the admission of The Correctional Association of New York's May 2010 report (the "CA report") because it is hearsay that does not qualify as a business record or a public record. *See* Dkt. No. 78 at 8-14. In opposition, Plaintiff seeks to have the CA report admitted for the truth of the statement contained therein. *See* Dkt. No. 93 at 9-13. Plaintiff does not argue that the report is not hearsay but asserts that the report is admissible under the public records exception to hearsay. *See* FED. R. OF EVID. 803(8) ("Rule 803(8)); Dkt. No. 93 at 9-13. For the reasons discussed below, the Court finds that the CA report should not be admitted into evidence at trial.

Rule 803(8) states that a record or statement of a public office are not excluded by the rule against hearsay if:

> (A) it sets out:
> (i) the office's activities;
> (ii) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
> (iii) in a civil case or against the government in a criminal case, factual finding from a legally authorized investigation; and
> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

11

The Correctional Association of New York ("Correctional Association") is a private, non-profit corporation that is registered with the New York State Department of State, Division of Corporations. *See* NYS Department of State, Division of Corporations, Entity Information, http://www.dos.ny.gov/corps/bus_entity_search.html (last visited September 15, 2015). The Correctional Association "is an independent non-profit organization that advocates for a more humane and effective criminal justice system." *See* Correctional Association of New York, http://www.correctionalassociation.org/about-us/mission- history (last visited Sep't 15, 2015). Its access to the New York State correctional facilities was granted by the New York State Legislature in 1846, *see* 1846 N.Y. Laws ch. 163, § 6, but any state-mandated inspections or reporting that the Correctional Association had were superceded, in 1929, by the establishment of the State Commission on Corrections (the "State Commission"), which was created to inspect and report on the prison facilities. *See* 1929 N.Y. Laws Ch. 243.

In 1975, the Commission was transferred out from under the Department of Correctional Services and became an executive department under the governor. *See* N.Y. Correction Law § 41; Memorandum of State Exec. Dep't, 1973 McKinney's Session Laws of N.Y., at 2214-15; Bonacquist, Practice Commentaries, McKinney's Consol. Laws of N.Y., Correction Law Article 3 (2015). In the Executive Memorandum, the Correctional Association is reference, as the functional predecessor of the Commission and a *private* association. *See* Memorandum of State Exec. Dep't, 1973 McKinney's Session Laws of N.Y., at 2214. The Correctional Association is also discussed in 1973 as having only "vestigial power of visitation and inspection," which would be repealed by the new statutory functions, powers, and duties of the State Commission. *See id.*

Accordingly, the Court finds that the Correctional Association is not a "public office" under Rule 803(8), and its reports should not be analyzed as such. Further, the legislative history

12

of Article 3 of the N.Y. Correction Law, the history of the State Commission development, and the current statutory authority granted to the State Commission indicate that the Correctional Association retains "vestigal power" to visit and inspect correction facilities, but the Correctional Association is under no legislative duty to visit, inspect, report, or make recommendations. Therefore, there is no indication that the CA acted or created the 2010 report pursuant to a "legally authorized investigation".

Plaintiff cites and quotes a 1973 version of Article 3 of the Correction Law, *see* Dkt. No. 93 at 10, that the State Commission was tasked with the responsibility to collect and disseminate statistical information and undertake research into the effectiveness of the correctional facilities' administration and programs. *See* 1973 McKinney's Session Laws of N.Y., Ch. 398, § 48(10), at 1463. In 1973, it was permitted for the State Commission to "cooperate with any public or private agency" to accomplish that responsibility. *See id.* Presumably, Plaintiff interprets that section to be referencing the Correctional Association as the private agency. Even assuming Plaintiff is correct, this subsection was repealed in 1975, and that duty to collect statistical information and perform research was turned over to the Division of Criminal Justice Services. *See* Bonacquist, Practice Commentaries, McKinney's Consol. Laws of N.Y., Correction Law Article 3 (2015).

The Court finds that the CA report is inadmissible hearsay that does not fall under the exception of Rule 803(8) for public records.

### *6. Grievance Complaints*

Defendants seek to preclude Plaintiff from introducing into evidence the grievance complaints that he filed while residing in the Coxsackie Correctional Facility. *See* Dkt. No. 78 at 14-15. Defendants claim that the report is hearsay and lack any probative value. *See id.* In

13

opposition, Plaintiff argues that the grievance reports are not being offered for the truth of the matters asserted therein, but, instead, are being offered: (1) to establish that Plaintiff filed these statements while incarcerated, (2) to provide context for the events giving rise to this action, and (3) to demonstrate Plaintiff's state of mine. The Court reserves judgment until the time of trial because based upon the parties' submissions, a ruling would be premature. *United States v. Chan*, 184 F. Supp. 2d 337, 340 (S.D.N.Y. 2002) (stating that courts may "reserve judgment until trial, so that the motion is placed in the appropriate factual context").

## IV. CONCLUSION

After carefully reviewing the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion *in limine* is **GRANTED in part** and **DENIED in part** as set forth herein; and the Court further

**ORDERS** that Plaintiff's motions *in limine* are **GRANTED in part** and **DENIED in part** as set forth herein; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 17, 2015
    Albany, New York

_____
Mae A. D'Agostino
U.S. District Judge